MUNICIPAL ELECTRIC ASSOCIATION
OF MASSACHUSETTS et al.,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

The Connecticut Light & Power Company, The Hartford Electric Light Company and Western Massachusetts Electric Company, Intervenors.

No. 22385.

United States Court of Appeals
District of Columbia Circuit.

Argued June 4, 1969.

Decided July 30, 1969.

Mr. George Spiegel, Washington, D. C. with whom Messrs. Worth Rowley and John C. Scott, Washington, D. C., were on the brief, for petitioners.

Mr. Israel Convisser, Attorney, Federal Power Commission, with whom Messrs. Richard A. Solomon, Gen. Counsel, Peter H. Schiff, Solicitor, and Drexel D. Journey, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent.

Mr. David R. Pokross, Boston, Mass., with whom Messrs. Maurice L. Zilber, Boston, Mass., and Jerome Ackerman, Washington, D. C., were on the brief, for intervenors.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and TAMM, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case brings before us for review a license granted by the Federal Power Commission to three private power companies [1] to construct and operate a large hydroelectric power plant on the Connecticut River at Northfield Mountain, Massachusetts. Petitioners, public power interests in Massachusetts,[2] contest

---

1. The Connecticut Light & Power Company, The Hartford Electric Light Company, and Western Massachusetts Electric Company.

2. Municipal Electric Association of Massachusetts; Town of Shrewsbury, Massachusetts, Electric Light Plant; Town of Wakefield, Massachusetts, Municipal Light Department; and City of Chicopee, Massachusetts, Municipal Lighting Plant.

the license on the grounds, first, that the licensees have failed to meet the statutory requirement that their project "be best adapted to a comprehensive plan for improving or developing a waterway \* \* \*," 16 U.S.C. § 803(a) (1964); and, second, that the Commission has failed sufficiently to safeguard against anticompetitive activities on the part of the licensees, in violation of 16 U.S.C. § 803(h) (1964). We affirm the Commission.

### I

The project in question is a pumped storage plant designed to provide power for periods of peak load. A large reservoir will be constructed on top of the mountain. During non-peak hours outside power sources will be used to pump water from the Connecticut River up into reservoir. During peak hours, water will be released to flow down from the reservoir through generating units constructed in the mountain. The project is licensed for a capacity of 1,000 megawatts (1,000,000 kilowatts), and is expected to cost some $72,000,000. When placed in operation in 1972 it will be the largest facility of its type in the world. Its capacity will be equal to approximately eight per cent of the 1973 New England peak load.

The licensees are affiliated with Northeast Utilities, a registered public utility holding company. They participate in the Connecticut Valley Electric Exchange (CONVEX), a power pool which serves an area with a population of over 3,700,000 people. Petitioners, intervenors before the Commission, represent the municipally owned power companies in Massachusetts. These companies must buy their power from large generating facilities which are all—like the proposed Northfield Mountain project—owned by the private power interests of New England.

The Commission is empowered to license power projects utilizing the navigable waters of the United States.[3] This is not a small power or one to be exercised lightly. The nation's rivers are among its geatest economic resources and natural treasures. A license to construct a power project using a river authorizes the licensee "to appropriate water resources from the public domain." Udall v. F.P.C., 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967). For these reasons, Congress has placed stringent conditions upon "[t]he grant of authority to the Commission to alienate federal water resources." *Ibid.* In particular, the statute provides that no license shall be issued unless

> "the project adopted \* \* \* shall be such as in the judgment of the Commission *will be best adapted* to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes \* \* \*."

16 U.S.C. § 803(a). (Emphasis added.) Thus the statute does not merely require that the license suit the public interest, or be appropriate, but in effect imposes a "highest and best use" standard. While generally we are to accept the factual findings of the Commission when they are supported by substantial evidence, and to grant deference to the expert "judgment of the Commission," the grant of servitudes upon the public's rivers requires our special scrutiny.

In this case, we find that the Commission has met its burden of justifying the license. First, an urgent need has been shown for new peak-load capacity in the area served by the licensees. The Northfield Mountain project is estimated to have a three-year construction period. It is expected to be producing 750 mw by 1971, and its full 1,000 mw capacity by 1972. Testimony before the hearing examiner showed that without the Northfield Mountain power CONVEX would have a power shortage of 314 mw by

3. 16 U.S.C. § 797(e) (1964).

1971, and of 666 mw by 1973, and further that by 1976 or 1977 CONVEX would absorb the entire 1,000 mw. The finding of immediate and urgent need for new peak-load capacity for the CONVEX system is uncontested here.

Second, the licensees have shown that there is no alternative feasible hydro-electric power source available to them which would provide the needed power more economically. The Commission so found, and that finding is not contested here. Third, the licensees have made extensive proposals to provide for the conservation and recreation interests of the areas adjacent to the Northfield project. The plan was assertedly developed after consultation with federal, state and local agencies, and with interested citizens' organizations. The licensees' conservation and recreation proposals have won the support of federal, state and local officials. No conservation or recreation interests opposed the grant of the license before the Commission.[4]

Against this impressive case for licensing the project, petitioners have raised two main contentions. First they have argued that the project has not been fitted into a comprehensive overall power plan for the New York-New England area. Partly in specification of this claim, and partly as a separate point, they have claimed that the licensees and the Commission have not adequately demonstrated that the project should be limited to a capacity of 1,000 mw. Petitioners argue that a 1,500 mw capacity is not only feasible but needed.

With respect to the first claim, the record indicates general agreement among all concerned that better overall planning of the power needs and resources of the region in question would be desirable. However, the five members of the Commission have concluded, with varying degrees of enthusiasm, that the licensing of this urgently needed power resource should not be further delayed in order to make it the vehicle for requiring such planning.[5] We are unable to say that they have abused their discretion or otherwise erred as a matter of law in so concluding.

The statute does not in terms require that a water power project be integrated into an overall regional power plan, but rather that it "be best adapted to a comprehensive plan for * * * a waterway * * *."[6] Here there is no claim that some crucial aspect of planning the use of the Connecticut River—engineering, economics, navigation, recreation or conservation—has been neglected. We need not hold that the Commission is never required to look beyond planning for the use of a single waterway in licensing a power project to conclude that, in view of the immediate need for Northfield power, the Commission was within its authority in licensing this project without the sort of planning urged by petitioners.

With respect to the second claim, the Commission has found that it is presently unable to determine whether a capacity of 1,500 mw is feasible at Northfield Mountain. It has further found that if the added capacity turns

4. *Compare* Scenic Hudson Preservation Conference v. F. P. C., 2 Cir., 354 F.2d 608 (1965), cert denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

5. Commissioner Bagge, writing for the Commission majority of three, noted that the licensees' planning studies "are not as broadly conceived in all respects as might be desired," but found that they were adequate to show the essential requirements for a license.

Chairman White, concurring, noted as "a matter of common knowledge" that there exists a "gross inadequacy of regional planning among the numerous electric systems operating in New England." However, he noted that the present licensing proceeding was not "the appropriate vehicle" to achieve "rational regional planning."

Commissioner Ross, concurring and dissenting, leveled a serious attack on the Commission's alleged failure to achieve regional planning in New England, but concluded: "Since we have been informed that power needs in New England are critical * * *, I concur rather than seek a remanded proceeding."

6. 16 U.S.C. § 803(a).

out to be needed, and if the river can absorb the additional disturbance caused by the greater volume of water required for the larger capacity, facilities for the extra 500 mw can be constructed at a cost not much greater than the incremental cost of constructing a larger facility all at one time. Substantial evidence supports these findings, and in view of them we cannot say that the Commission's decision to allow immediate construction of the urgently needed smaller facility is unreasonable.[7]

## II

Petitioners argue that the licensees have engaged and are engaged in anticompetitive practices, and that the license should be granted only upon express condition that those practices cease. The Commission concedes that antitrust factors are relevant to its decision to grant, withhold or condition a water power license. *Cf.* Northern Natural Gas Co. v. F.P.C., 130 U.S.App. D.C. 220, 226–227, 399 F.2d 953, 959– 960 (1968).

The anticompetitive practices alleged here break conveniently into three categories. First, and most easily disposed of, is the claim that the licensees may discriminate against municipally owned power companies in the sale of the excess power generated at Northfield Mountain during the period before the licensees themselves can absorb the full output of the project. The Commission has fully satisfied this claim by granting the license on condition that the licensees make such power available to petitioners on a non-discriminatory basis, and that they agree to transmit such power to the limits of their lines.

Second, petitioners contend that Northfield Mountain is a link in a general boycott, conducted by private power interests in New England, denying municipal power companies access to sources of bulk power and transmission facilities. The Commission answers that the conditions it has imposed, noted above, sufficiently guarantee that this project will not be used as part of such a boycott. We accept this as sufficient compliance, in the context of licensing this urgently needed project, with the Commission's statutory responsibility to prevent the use of water power projects licensed by it for anticompetitive ends. We note in passing that, apparently partly as a result of another proceeding in this court,[8] petitioners will be granted partial ownership of another new bulk power resource in New England[9]—a remedy which they have not sought in this case.

Finally, petitioners allege that they have been excluded from participation in the planning of this project, and from planning and clearinghouse services in the New England power industry generally, by the refusal to admit them to membership in the Electric Coordinating Council of New England (ECCNE), of which the licensees are members. With respect to this contention, the Commission has found that it has not been sufficiently shown that "ECCNE has engaged in any significant planning activities, the denial of participation in which resulted in any important adverse consequences to the Municipals." The Commission further noted that a new regional planning organization was being formulated; that the municipal power companies would be admitted to membership in this organization; and that the terms of the agreement would be subject to the regulatory jurisdiction of the Commission.

In the light of these factors, the lack of any strong showing that ECCNE

---

7. Petitioners also attack the Commission's approval of the use of 345 kv rather than 500 kv transmission lines for the project. The Commission has given a rational ground—cost differentials—for its judgment on this rather technical question, and we do not disturb this judgment.

8. Municipal Electric Ass'n of Massachusetts v. S. E. C., 134 U.S.App.D.C. ——, 413 F.2d 1052 (decided March 26, 1969).

9. The Wall Street Journal, June 4, 1969, at 7, cols. 2–4.

played a role in the planning of Northfield Mountain, and the virtual mootness of the issue of the "ECCNE boycott," we cannot conclude that the public interest requires remand to the Commission for the imposition of further explicit antitrust conditions on the license. This is not to say that petitioners' contentions of a planning boycott are insubstantial or irrelevant; rather that the Commission was within its discretion in deferring consideration of them in view of the changing structure of power planning organization in New England.[10]

Affirmed.

---

10. The Act prohibits monopolistic practices by licensees, whether or not specific conditions are placed in the license, 16 U.S.C. § 803(h), and provides that interested parties may complain of any violations, with the provision that, if the alleged violator's response is unsatisfactory, the Commission must investigate further. 16 U.S.C. § 825e (1964).