No. 71–1219.  SCENIC HUDSON PRESERVATION CONFERENCE ET AL. *v.* FEDERAL POWER COMMISSION ET AL.;

No. 71–1220.  CITY OF NEW YORK *v.* FEDERAL POWER COMMISSION ET AL.; and

No. 71–1221.  SIERRA CLUB ET AL. *v.* FEDERAL POWER COMMISSION ET AL.  C. A. 2d Cir.  Motion to dispense with printing the Federal Power Commission opinion in No. 71–1219 to conform with Rule 39 of the Rules of this Court granted.  Certiorari denied.  Reported below: 453 F. 2d 463.

MR. JUSTICE DOUGLAS, dissenting.

These petitions should be granted to consider whether the Federal Power Commission complied with its obligations under §§ 101 and 102 of the National Environ-

mental Policy Act of 1969, 83 Stat. 852, 42 U. S. C. §§ 4331 and 4332, in granting a license to Consolidated Edison Company of New York, Inc., for the construction of a pumped storage power project on, Storm King Mountain on the Hudson River.

Under § 101 of the Act federal agencies are instructed to take environmental consequences into account in their decisionmaking.[1] That mandate was aimed partly at eliminating the excuse which had often been offered by bureaucrats that their statutory authority did not authorize consideration of such factors in their policy decisions. See *Udall* v. *FPC*, 387 U. S. 428.[2] More impor-

---

[1] Section 101 of the National Environmental Policy Act, 83 Stat. 852, 42 U. S. C. § 4331, provides in pertinent part:

"(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

"(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

"(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

"(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice."

[2] In that case we held that the grant of authority to this Commission to alienate federal water resources does not turn simply on whether the project will be beneficial to the licensee. Nor is the test solely whether the region will be able to use the additional power. We said: "The test is whether the project will be in the public interest. And that determination can be made only after an exploration of all issues relevant to the 'public interest,' including . . . the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife." 387 U. S., at 450.

The Commission's attitude in that case reappeared in the present

tantly, § 101 was meant as an affirmative duty "to *consider* environmental issues just as they consider other matters within their mandates." *Calvert Cliffs' Coordinating Committee, Inc.* v. *AEC*, 146 U. S. App. D. C. 33, 36, 449 F. 2d 1109, 1112.

Section 102 [3] requires that administrators incorporate

case: "Implicit in the reasoning of the Commission and the Examiner is the assumption that this project must be built and that it must be built now." 387 U. S., at 448.

[3] Section 102 of the National Environmental Policy Act, 42 U. S. C. § 4332, provides in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on——

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by

certain procedures into their operating routines in order (1) to increase the likelihood that environmental consequences of agency action will not be unforeseen and (2) to insure that if a project is approved, an environmentally acceptable alternative will be chosen. Section 102 (2)(C) requires a detailed statement in connection with actions significantly affecting the quality of the human environment, specifying the environmental impact of the proposed action and alternatives. Section 102 (2) (D) places bureaus under an affirmative duty to study and develop alternatives where there are unresolved conflicts concerning the alternative uses of available resources.

This case poses issues under both sections. In 1964 the Consolidated Edison Company of New York (Con Ed) proposed to the Commission that it be allowed to construct a reservoir atop Storm King Mountain along with a hydroelectric generating plant to be driven by water falling from the reservoir. During the daytime hours when energy demand is high the plant would be operational, but during the evening hours when part of Con Ed's existing facilities are normally idle, power from one of its existing plants would be used to pump water from the Hudson River to the reservoir. In 1965 the Commission approved the project but the Court of Appeals for the Second Circuit in a suit brought by conservationists and local residents set aside the order and remanded for more detailed consideration of various environmental aspects of the project. *Scenic Hudson Preservation Conference* v. *FPC*, 354 F. 2d 608 (CA2).

---

section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . ."

After more hearings had been completed but before the Commission acted, the National Environmental Policy Act of 1969 became effective. Although it has been conceded that the Act's requirements were applicable in these proceedings, no further hearings were held; and no environmental impact statement was drafted. The Commission approved the project and attempted to satisfy its procedural duties under § 102 by specifying certain environmental impact forecasts in its final opinion.

The Court of Appeals affirmed, over the dissent of Judge Oakes, who thought that the Commission had not discharged its obligations under NEPA. 453 F. 2d 463. The majority held that under § 101 the ultimate balance of energy and environmental values was the responsibility of the Commission, and courts could upset only decisions not supported by "substantial evidence." It also held, with respect to the procedural requirements of § 102, that the Commission's hearings and consultation with other agencies satisfied the command that a "systematic, interdisciplinary approach" be utilized.[4] It also found that the Commission's final opinion which contained its environmental findings would, under the circumstances, suffice as an environmental impact statement. A petition for rehearing *en banc* was denied by an equally divided court, with Judge Timbers dissenting in a short opinion which expressed doubt as to the validity of the majority's reliance on the "substantial evidence" test, *id.*, at 494.

I believe the Court of Appeals gave the Act too restrictive a meaning. As to the Commission's duty to take environmental impact into account, Judge Oakes, in his dissenting opinion, made a strong case for the view that the Commission (a) misjudged the risk that project construction might work irreparable injury to one of

---

[4] NEPA, § 102 (2) (A).

three vital water supply systems serving New York City; (b) underestimated the extent of additional air pollution which would be generated by nighttime burning of fossil fuels in New York City in order to generate the power needed to pump the river water to the reservoir; and (c) generally undervalued environmental considerations while overvaluing engineering and economic considerations. Although value judgments are inevitable and even though the Commission's balancing of environmental costs with other factors may · be entitled to some deference, I share Judge Timbers' doubts that under § 101 the balance struck by an agency unskilled in environmental matters should be reviewed only through the lens of the "substantial evidence" test. Cf. *Citizens To Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 413 ("If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems"). But see *Calvert Cliffs', supra,* at 39, 449 F. 2d, at 1115.

I also am not satisfied that the procedural obligations under § 102 were. honored. First, the Commission did not draft the impact statement required by § 102 (2)·(C). Thus, when the Commissioners deliberated the fate of Storm King Mountain, they did not have before them a coherent study addressed to the environmental consequences of the project and alternatives to it. Another panel of the Second Circuit has recently ruled that the impact statement must be written *before* action is taken. *Greene County Planning Board* v. *FPC,* 455 F. 2d 412 (CA2). Administrators cannot attempt to comply with the Act by calling their final opinion their impact statement. True, here the hearings had been completed after the Act became effective. Yet the Commission could have deferred decision until its own § 102 statement was prepared.

Second, the Commission's final opinion suggests that its consideration of environmental issues is required only when private citizens bring such problems to the agency's attention. For example, in many passages of its opinion the Commission states that particular objections to the project had been rejected for lack of evidence in the administrative record.[5] This approach—symptomatic of the phenomenon of bureaucratic "industry-mindedness"—wrongly assumed that a presumption of validity supported the Con Ed proposal and that environmental groups had a burden of proof to overcome.

Similarly, the Commission limited its inquiry primarily to those program alternatives which had been submitted by the conservationists opposing the Con Ed project. The agency did not generate its own alternatives, although Congress charged each federal agency to represent not only the public interest in general but also under NEPA to pay particular attention to the environmental ramifications of its actions. Whether or not conservationists appear to register dissent, the Commission is told in § 102 (2)(D) to "study, develop, and

---

[5] For example, see Judge Oakes' dissent below, 453 F. 2d 463, 482. Scenic Hudson's Petition A47. See also the opinion of the Federal Power Commission, No. 584, *Consolidated Edison Company of New York, Inc., Project 2338,* 44 F. C. C. 350: "There has been no showing that a combination nuclear-gas turbine alternative offers any advantages or indeed is even reasonably equivalent to Cornwall." *Id.,* at 377. "None of the interveners presented any evidence on alternative hydroelectric sites." *Id.,* at 379. "The record is uncontradicted, and we find, that there is no feasible hydroelectric alternative to Cornwall." *Ibid.* "No party to this proceeding has suggested any other plan or project for improving or developing the waterway . . . ." *Id.,* at 388. And see *id.,* at 409 n. 25, stating in part that "[t]here is no evidence concerning the condition of the Aqueduct's lining. Its structural integrity is unknown to the City or any of its witnesses."

describe appropriate alternatives to recommended courses of action . . . ." The agency is directed to apply its own expertise and imagination in exploring less drastic alternatives. And, one alternative, which went completely overlooked by the Commission, as Judge Oakes noted below, is not to build any project at all. Whether that option is realistic we do not know. Informing the public and Congress on that score is the function of the impact statement. In short, the Act requires that bureaucrats not only listen to protests, but also avoid projects that have imprudent environmental impacts. There is no burden of proof for the objector to overcome.

Finally, the Commission's opinion is too imprecise to provide any helpful insight for Congress, the Council on Environmental Quality, or the public into what value judgments it made. We know that the Commission rejected alternatives with less deleterious environmental consequences on the ground that they were "more" costly and "less" reliable. But we have no reasonably precise notion of how much reliability and money were gained at the expense of the destruction of Storm King Mountain. Whether or not courts may review the Commission's ultimate balance of these competing considerations, the fact remains that Congress and the public are entitled to know those judgments. One function of the § 102 statement is certainly to make explicit the priorities of the agencies. That purpose is not served where all that is basically told is that the preferred alternative is cheaper and more reliable, though involving adverse implications for the surrounding ecology.

If this kind of impact statement is tolerated, then the mandate of NEPA becomes only a ritual and like the peppercorn a mere symbol that has no vital meaning. The decision below is, in other words, the beginning of the demise of the mandate of NEPA.

I would grant these petitions.