917 F.2d 589
 286 U.S.App.D.C. 367
 WOOLEN MILL ASSOCIATES, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Burlington Electric Department, City of Winooski, Vermont,
Winooski One Partnership, Intervenors.
 Nos. 89-1388, 89-1389.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 10, 1990.
Decided Oct. 30, 1990.
 
 Carmen L. Gentile, with whom David E. Goroff and William J. Collins, Washington, D.C., were on the brief, for petitioner in 89-1388 and 89-1389.
 Katherine Waldbauer, Atty., F.E.R.C., with whom William S. Scherman, General Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent in both cases.
 Peter C. Kissel, with whom Elisa J. Grammer, Washington, D.C., for Winooski One Partnership, Frances E. Francis and Marc R. Poirier, Washington, D.C., for Burlington Elec. Dept., and William J. Madden, Jr., Washington, D.C., for City of Winooski, were on the joint brief, for intervenors in both cases. William E. Wargo, Winooski, Vt., also entered an appearance, for intervenor City of Winooski.
 Before MIKVA, SILBERMAN and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HENDERSON.
 HENDERSON, Circuit Judge:
 
 
 1
 The petitioner in these consolidated proceedings, Woolen Mill Associates ("WMA"), seeks review of orders issued by respondent Federal Energy Regulatory Commission (the "Commission") which (1) granted a license to the intervenors, The City of Burlington Electric Department ("Burlington") and the Winooski One Partnership (the "Partnership"), to construct, operate and maintain a hydroelectric project on the Winooski River in Chittenden County, Vermont and (2) certified the project as a Qualifying Small Power Production Facility. For the reasons set forth below, we deny the petitions for review.
 
 I.
 
 2
 In 1980, Burlington applied to the Commission for a license to refurbish and expand an existing timber crib dam on the Winooski River near Burlington, Vermont, for the production of hydroelectric power. Some time later, Burlington reached an agreement with the Partnership to jointly undertake the project, to be known as the "Chace Mill Hydroelectric Project," and the two filed an amended application on November 3, 1986. At that time they planned to install bascule gates atop the timber crib dam, thereby restoring it to its original height of 136 feet above sea level[1] and enlarging its impoundment to approximately 5.5 acres, and to add an intake structure, two buried penhouses, a powerhouse, a tailrace and a fish trapping station. On March 30, 1987, Burlington and the Partnership filed a correction to the amended application reflecting plans both to consolidate the intake structure and powerhouse, eliminating the need for penhouses, and to install the bascule gates on a new concrete abutment immediately downstream from the existing timber crib dam rather than erecting them atop the existing dam as originally contemplated.
 
 
 3
 On August 21, 1987, the Commission issued a notice of application setting October 2, 1987, as the deadline for comments, protests or motions to intervene in the licensure proceeding. In response WMA, which owns an apartment building near the site of the proposed facility, filed with the Commission a document opposing the license and petitioning to intervene and several petitions and letters signed by area residents opposed to the licensure. On November 3, 1988, the Commission issued an order licensing the Chace Mill project. WMA then filed a petition for rehearing which the Commission denied by order dated April 21, 1989.
 
 
 4
 While the licensing proceeding was pending, Burlington and the Partnership also applied to the Commission for certification of the Chace Mill project as a Qualifying Small Power Production Facility under section 210 of the Public Utilities Regulatory Policies Act of 1978 ("PURPA"), as amended by section 8(a) of the Electric Consumers Protection Act of 1986 ("ECPA"), 16 U.S.C. Sec. 824a-3 (1988). WMA filed a petition to intervene in the certification proceeding and a motion to consolidate the certification and license proceedings. On October 3, 1988, the Commission issued an order granting WMA leave to intervene in the certification proceeding and certifying the Chace Mill project as a Qualifying Small Power Production Facility. WMA petitioned for rehearing on the certification and the petition was denied by order dated April 21, 1989.
 
 
 5
 WMA has petitioned this Court to review both the licensing and the certification orders. We address the two matters separately.
 
 II.
 
 6
 First, WMA seeks review of the licensing orders on the grounds that (1) the record does not support the Commission's finding that the project is in the public interest and (2) the Commission deprived WMA of due process by failing to conduct a hearing or to provide requested discovery. We find neither ground meritorious.
 
 
 7
 First, we consider WMA's challenge to the Commission's finding that the Chace Mill project is in the public interest. Section 4(e) of the Federal Power Act authorizes the Commission to issue licenses to construct and operate dams on navigable streams. 16 U.S.C. Sec. 797(e) (1988); see Idaho Power Co. v. FERC, 865 F.2d 1313, 1314 (D.C.Cir.1989). Section 10(a) of the Federal Power Act requires as a condition for licensing that "the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 797(e) of this title." 16 U.S.C. Sec. 803(a) (1988). Pursuant to this provision, the Commission must, before issuing a license, make a determination that a given facility is "in the public interest," after considering all relevant factors, including "future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife." Udall v. FPC, 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869 (1967); see also Idaho Power Co. v. FERC, 865 F.2d at 1314-15; Friends of the River v. FERC, 720 F.2d 93, 97-98 (D.C.Cir.1983).
 
 
 8
 In the November 3, 1988 licensing order, the Commission, relying on an "Environmental Assessment" produced by its staff and appended to the order, concluded the project is in the public interest because a need for additional energy exists which the Chace Mill facility can help fill. At the same time, the Commission concluded, the Chace Mill facility will conserve nonrenewable energy sources and reduce pollution by displacing fossil fuel power generation. In its rehearing order, the Commission further found, relying on a staff "Safety and Design Assessment" which had been appended to the November 3, 1988 order, that the project will serve the public interest by providing economic benefit in the form of an annual levelized savings of $603,000 over alternative energy sources. In addition, both orders found that construction of the project will not have any significant adverse effect on the environment or on WMA's rental income. WMA's challenge notwithstanding, all of these findings are supported by substantial evidence, namely the findings and data set forth in the Environmental Assessment[2] and in the Safety and Design Assessment.[3] Accordingly, we decline to review the Commission's conclusion that the project is in the public interest. See 16 U.S.C. Sec. 825 l(b) (1988); Friends of the River, 720 F.2d at 98.
 
 
 9
 Next, we consider WMA's contention that the Commission deprived it of due process by failing to hold a hearing or provide discovery. We reject this argument for the following reasons.
 
 
 10
 First, the decision whether to conduct a hearing is in the Commission's discretion, Cerro Wire & Cable Co. v. FERC, 677 F.2d 124, 128 (D.C.Cir.1982), and it is not an abuse of that discretion to deny a motion for hearing when there are no material facts in dispute, Pennsylvania Pub. Utility Comm'n v. FERC, 881 F.2d 1123, 1126 (D.C.Cir.1989); Cerro, 677 F.2d at 128-29. Further, mere allegations of disputed fact are insufficient to mandate a hearing; a petitioner must make an adequate proffer of evidence to support them. Pennsylvania, 881 F.2d at 1126; Cerro, 677 F.2d at 124. We find no abuse of discretion in the Commission's failure to conduct a formal evidentiary hearing as the record reveals no substantial evidence contradicting any material finding by the Commission. In addition, we note that WMA had ample opportunity to submit whatever evidence it desired throughout the licensure proceeding. Accordingly, we find no due process violation in the Commission's failure to conduct a formal hearing.
 
 
 11
 Nor do we find any deprivation of due process in the alleged discovery denial. WMA requested two broad classes of documents in letters its counsel sent to the Director of the Commission's Office of Hydroelectric Licensing.[4] The Commission's rules, however, require that any request for the documents sought be made pursuant to the Freedom of Information Act, 18 C.F.R. Sec. 380.9 (1990), and that the request be "in writing, addressed to the Director of Public Affairs, and clearly marked Freedom of Information Act Request." 18 C.F.R. Sec. 388.108 (1990). Having ignored the published procedure for obtaining the desired documents, WMA cannot now complain of the Commission's failure to produce them. While the Commission's handling of WMA's requests was less than accommodating, it does not amount to reversible error.
 
 
 12
 For the preceding reasons, we decline to review the Commission's orders licensing the Chace Mill project.
 
 III.
 
 13
 Next, we consider WMA's challenge to certification of the Chace Mill project as a Qualifying Small Power Production Facility and decline to review that determination as well.
 
 
 14
 Section 210 of PURPA, as amended by the ECPA, authorizes the Commission to certify small hydroelectric power plants which do not involve construction of a new dam as Qualifying Small Power Production Facilities, entitling them to certain benefits.[5] 16 U.S.C. Sec. 824a-3 (1988). Under the statute, a "new dam" is defined as one "which requires, for purposes of installing any hydroelectric power project, any construction, or enlargement of any impoundment or diversion structure (other than repairs or reconstruction or the addition of flashboards or similar adjustable devices)." 16 U.S.C. Sec. 824a-3(k) (1988). The Commission concluded that, although the proposed Chace Mill project will require construction of a new concrete abutment and will result in an enlarged impoundment, it nevertheless falls outside the statutory definition of a new dam because erection of the new abutment constitutes "reconstruction" of the existing dam and because the impoundment enlargement will be accomplished by adding bascule gates which are adjustable devices similar to flashboards. WMA challenges the Commission's determination on the ground that either the new abutment or the enlarged impoundment is sufficient to render the proposed facility a "new dam."
 
 
 15
 The legislative history of the 1986 amendment to section 210 reveals that Congress recognized an inherent ambiguity in the statutory definition of a "new dam," as applied to new construction at the site of an existing dam, and expressly authorized the Commission to determine in each case whether such construction will result in a "new dam":
 
 
 16
 The conferees understand that under certain circumstances there may be an ambiguity in the definition of the term "new dams or diversions" with regard to reconstruction and in connection with existing dams. The ambiguity is whether a new dam at the site of an existing dam should be construed to be a new dam under the provisions added to the law by the conference agreement. This problem, if real, cannot be resolved on a generic basis by the conferees. It will have to be examined on a case-by-case basis. We note that in some cases, it may be appropriate and reasonable to build, for environmental and safety reasons, a new dam upstream and adjacent to an existing dam that will not expand the impoundment. The conferees presume that before FERC determines whether such dam is a new or existing dam, it will obtain the views of the various Federal and State environmental agencies, and all other interested parties, to ensure that, in fact, the particular proposal can qualify as "reconstruction" under the definition.
 
 
 17
 H.R.Rep. No. 99-934, 99th Cong., 2d Sess. 30 (1986), U.S.Code Cong. & Admin.News 1986, pp. 2496, 2547. Because of this express delegation of authority, we must defer to the Commission's determination so long as it is based on a reasonable construction of the statute. Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984) (even without express delegation, an agency's reasonable interpretation of an ambiguous statute must be upheld). In classifying the proposed facility as an existing, rather than a new, dam, the Commission reasonably determined that the concrete abutment to be erected immediately adjacent to the timber crib dam should be considered reconstruction of the existing dam.[6] As for the enlarged impoundment, it was likewise reasonable for the Commission to determine that the bascule gates are adjustable devices similar to flashboards. WMA does not dispute that bascule gates are adjustable but contends they are not similar to flashboards because they are not removable. The statutory language, however, imposes no requirement that similar devices be removable, only that they be adjustable.
 
 
 18
 Because the Commission certification orders relied on a permissible construction of the statutory definition of "new dam," they are not subject to this Court's review.
 
 
 19
 For the reasons set forth above, the petitions for review are
 
 
 20
 Denied.
 
 
 
 [1]
 A 1954 flood removed the top eight feet of the structure
 
 
 [2]
 The Environmental Assessment expressly found that (1) the New England Power Pool projected "average annual growth rates of 2.7 percent for summer peak demand and 1.7 percent for annual energy requirements" and that power from the Chase Mill project "would be useful in meeting a small part" of that demand, while also reducing the combustion of fossil fuels for energy; (2) "the proposed construction activity would not be expected to reduce the rental income of [WMA's building]" and that "the completed project would not adversely affect the long-term rental value of apartment units [in WMA's building]"; and (3) license issuance "would not constitute a major federal action significantly affecting the quality of the human environment."
 
 
 [3]
 The Safety and Design Assessment expressly found:
 Staff has identified projected long-term levelized alternative energy costs in the region of about 126.9 mills per kilowatt hour. Since the levelized cost of energy from the project is estimated to be 99 mills per kilowatt hour, the project is estimated to provide a levelized economic benefit of 27.9 mills per kilowatt hour or about $603,000 annually.
 
 
 [4]
 The first letter, dated May 23, 1988, requested:
 Please provide copies of all documents used by the Staff and all memoranda and other writings of any kind developed by the Staff in the "need for power" (II-B) portion of the Environmental Assessment which is dated April 15, 1988, but which was not made available until last week. The foregoing are necessary in order to understand the basis for the conclusion in that section of the report.
 The second letter, dated May 31, 1988, contained the following request:
 Page 27 of the [Environmental Assessment] contains this statement:
 Tenants of the Forest Hills Mill [i.e., the Woolen Mill] apartments, moreover, are unlikely to find rental units that offer comparable long-term aesthetic qualities. Consequently, the proposed construction activity would not be expected to reduce the rental income of the Forest Hills Mill [i.e., the Woolen Mill].
 Please provide copies of all studies performed by the Staff to support this opinion. Please also provide copies of all documents used by the Staff and all memoranda and other writings of any kind developed by the Staff in connection with the quoted statement.
 
 
 [5]
 A new dam may also be so certified if it meets certain additional requirements. See 16 U.S.C. Sec. 824a-3(j)(1) (1988)
 
 
 [6]
 Cf. The Steamboaters v. FERC, 759 F.2d 1382, 1391-92 (9th Cir.1985) (upholding the Commission's determination that a concrete dam built immediately downstream of an existing wooden one was an "existing dam" under 16 U.S.C. Sec. 2708(a)(6))