**FRIENDS OF THE PAYETTE
and Idaho Rivers United,
Inc., Plaintiffs,**

v.

**HORSESHOE BEND HYDRO-
ELECTRIC COMPANY, et
al., Defendants.**

**No. CIV 92–0135–S–MJC.**

United States District Court,
D. Idaho.

June 25, 1992.

Jim Jones, Boise, ID, for plaintiffs.

D. Marc Haws, Asst. U.S. Atty. Terry E. Coffin, Steven R. Matthews, Coffin Matthews & Von Tagen, Boise, ID, David P. Hirschi, Salt Lake City, UT, Maurice O. Ellsworth, U.S. Atty., Boise, ID, for defendants.

## MEMORANDUM DECISION

CALLISTER, Senior District Judge.

## INTRODUCTION

Clean energy and wilderness preservation are typically harmonious goals. To preserve lakes and forests, we reduce the acid rain produced by coal-fired power plants; to protect the land and future generations from radioactive waste, we ban nuclear power. Unfortunately, however, there are times when the production of clean energy compromises wilderness values, and this case presents such a circumstance: By borrowing the power of a river, a hydroelectric facility runs clean, but inevitably affects the sweep of water within its reach. Are we forced by this circumstance to trade one environmental goal for another, to "choose" between pollution-free energy and river habitat? We need both. Can we get there?

Clean energy is not free. If we want to depend on charitable efforts to reduce pollution, our patience would outlast our existence. Utilities and developers must be allowed a financial return to solve these pollution problems. But a developer must be prepared to give up some of that financial return to eliminate or mitigate environmental damage caused by the clean energy project. How large should the financial reparation be? That decision has been taken away from the developer and handed over to various state and federal agencies for resolution. In some cases the damage to the environment is so great, and the required mitigation so expensive, that the project is rightly doomed. But in the case now before the Court, the project owners have absorbed substantial extra costs imposed by the governmental agencies to ameliorate environmental damage. These federal and state agencies have now fully examined the project and given their approval.

The plaintiffs basically assert that the governmental agencies have not gone far enough in requiring the project owners to mitigate environmental damage. In this lawsuit, the Court is called upon to determine whether the decision of the agencies allowing the project to go forward is reasonable.

## OVERVIEW OF THIS CASE

The plaintiffs—Friends of the Payette and Idaho Rivers United, Inc.—brought this action to challenge a decision by the Army Corps of Engineers (Corps) to issue a permit under § 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344. This § 404 permit was the last of a string of permits the defendant Horseshoe Bend Hydroelectric Company (HBHC) was required to obtain to construct a hydroelectric power project on the Payette River. The project will divert water from the Payette River through a power house before returning the water to the river. The § 404 permit allows HBHC to place dredged or fill material in the river.

To determine whether the § 404 permit was properly issued, this Court is guided by two important considerations. First, although the Corps itself did not hold a public hearing, it did solicit and receive a large volume of written public comments on the project which are part of the record reviewed by this Court. Second, this is an appeal from a decision by the Corps, and this Court has no authority to independently review the facts or re-open the case for

public comment except under limited circumstances not present here.

With these considerations in mind, the Court will turn to the facts of this case, followed by a procedural history of the litigation and a discussion of the governing legal principles.

## FACTS

The North and South Forks of the Payette River charge out of narrow, boulder-choked canyons to come together a few miles above the town of Horseshoe Bend. As it enters town, the river calms and forms a lazy curve that gives the town its name.

A scenic river like the Payette needs protection, and the Idaho legislature provided a measure of it in 1991 by ratifying the Comprehensive State Water Plan for the Payette River Reaches adopted by the Idaho Water Resource Board. Idaho Session Laws, ch. 221 (1991). This plan offers substantial protection for the North and South Forks, and the Main Fork to a section just upstream from Horseshoe Bend. The one stretch of river left unprotected is the section this hydropower facility will affect. But the give-and-take that brought life to the Payette River Plan, and allowed HBHC's project to remain, did not affect the many regulatory approvals HBHC had to secure before it could proceed with construction.

This regulatory approval process began in 1983 when HBHC's predecessor-in-interest, Boise Cascade Corporation, first applied for the necessary permits from both federal and state agencies. The project as proposed then, and as it still exists today, will divert water from the Payette River by means of an inflatable bladder diversion dam, and send the water down a three-and-one-half mile diversion canal to a power house. After passing over the power house turbines, the water will be returned to the Payette River via a tailrace. The project is being built at the location of a similar hydropower plant operated from 1902 until 1954. This has lessened the environmental impacts of the project because HBHC did not need to cut a new swath for the canal but could simply widen the existing one.

During operation, the project will divert up to 3,500 cubic feet per second (cfs) of water through the power canal, bypassing a four-and-one-half mile stretch of river. The diversion dam will be operated to maintain at least 400 cfs in the bypassed stretch. On the basis of historical data, it is expected that the flows will greatly exceed 400 cfs in the bypassed stretch between April and July, but will be lowered to 400 cfs between August and March. Record at 187.

The de-watering of the bypassed stretch forms the core of plaintiffs' complaint. It is projected that flows in, say, August and September, that might normally measure 3,500 cfs, will drop to 400 cfs in the bypassed stretch. These complaints will be discussed in more detail later in this opinion.

To build the diversion dam, HBHC needed a permit from the Federal Energy Regulatory Commission (FERC). FERC completed an Environmental Assessment on August 7, 1984, and a supplemental Environmental Assessment on April 1, 1986. These Environmental Assessments concluded that the project would have no significant impact on the environment. FERC approved the project on June 30, 1986, and issued its license, which included thirty-nine specific conditions designed to reduce environmental harm. Record at 49. Idaho Power Company appealed FERC's decision to the D.C. Court of Appeals on the ground that Idaho Power Company was being improperly required to purchase the electricity generated by the project. No other party appealed. The D.C. Court of Appeals disagreed with Idaho Power Company's complaints and affirmed FERC's decision to grant a license for the project. *Idaho Power Company v. FERC*, 865 F.2d 1313 (D.C.Cir.1989).

HBHC thereafter obtained the necessary state permits. On May 21, 1991, the Idaho Department of Water Resources granted a water rights permit; on March 13, 1992, the Idaho Department of Environmental Quality issued a water quality certificate;

and on January 13, 1992, the Idaho Department of Lands issued a permit granting HBHC access to submerged state lands for construction purposes.

Finally, HBHC needed a permit from the Corps to place dredged or fill material in the river, primarily in connection with the construction of the diversion dam and tailrace. The Corps did another Environmental Assessment which was completed and signed on March 30, 1992. This Environmental Assessment, like the one done by FERC six years earlier, found that the project would have no significant impact on the environment. The Corps also mailed a public notice of application for permit to some 221 entities and received a thick stack of public comments in addition to numerous criticisms and suggestions from other agencies examining the project. The Corps made a substantial effort to respond to these concerns, and adopted many of the suggestions by attaching conditions to the permit. The Corps issued the § 404 permit on March 30, 1992. This permit contains seventeen special conditions designed to reduce environmental harm, and is also governed by the thirty-nine conditions of the FERC license. Record at 2045–2050.

Shortly after the § 404 permit was issued, plaintiffs filed this lawsuit against HBHC, FERC, the Corps, and the Idaho Division of Environmental Quality (IDEQ). The action against IDEQ was dismissed by stipulation, and the Court dismissed FERC after finding that the Courts of Appeal have exclusive jurisdiction over appeals from decisions of FERC. These rulings leave HBHC and the Corps as the only remaining defendants. The complaint seeks a declaration that the § 404 permit is invalid because the Corps failed to prepare an Environmental Impact Statement (EIS), among other things.

This Court set this case for trial on May 11, 1992, and combined with the trial plaintiffs' request for an injunction. But after examining HBHC's motion to exclude extra-record testimony, the Court was convinced that the Ninth Circuit law prohibited the introduction of new evidence in what is basically an appeal from an agency ruling unless testimony is needed to explain an agency's action, explain an agency's bad faith, or explain technical terms. *See* Memorandum Decision issued May 5, 1992.

At the hearing of May 11, 1992, plaintiffs proffered the expected testimony of their witnesses and the Court found, with the exception of William McDonald, that plaintiffs had not made the required showing to be entitled to submit the extra-record testimony.

The Court did take testimony from William McDonald, the § 404 permit manager for the Corps. McDonald testified first that the FERC license contained a condition that a fisheries mitigation plan be developed and that the Idaho Department of Fish & Game would monitor compliance with the plan. In addition, the Department of Fish & Game had the right to demand further changes if the mitigation plan proved insufficient.

McDonald further testified concerning the finding of the Corps that an alternative bypass flow of 600 cfs would be uneconomical for HBHC. The Corps used the economic data HBHC provided for bypass flows of 400 cfs and 600 cfs to further conclude that a bypass flow of 500 cfs would likewise be uneconomical. He further testified that the Idaho State Historical Society has an archeologist who will be monitoring the project.

At the conclusion of the hearing, the Court ordered counsel to submit briefing. That briefing was completed on June 1, 1992, and the case is now at issue. The question before the Court is whether the Corps complied with the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), the Clean Water Act (CWA), and the Administrative Procedures Act (APA) in issuing the § 404 permit to HBHC.

## STANDARD OF REVIEW

The central issue in this case is whether the Corps should have prepared an EIS under NEPA. The Ninth Circuit has laid out the standard this Court must employ in reviewing an agency's decision not to prepare an EIS:

If the agency finds, based on a less formal and less rigorous "Environmental Assessment," that the proposed action will not significantly affect the environment, the agency can issue a finding of no significant impact (FONSI) in lieu of the EIS. We will uphold an agency decision that a particular project does not require an EIS unless that decision is unreasonable. The reviewing court must assure, however, that the agency took a "hard look" at the environmental consequences of its decision.

*Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir.1988) (citations omitted).

■ The standard of review under the CWA, ESA, and APA is abuse of discretion. *Friends of the Earth v. Hintze*, 800 F.2d 822, 830 (9th Cir.1986).

### Should the Corps have Prepared an EIS?

■ NEPA requires an agency to prepare an EIS for every "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). The Corps concedes that the project constitutes "major federal action" but argues that there is no significant affect on the environment.

The first step in NEPA's procedural scheme is to prepare an EA, a "brief document" that examines the project's environmental consequences. If those consequences are significant, the EA will conclude that a full EIS must be done. But if those consequences are not significant, the EA will conclude with a FONSI (Finding of No Significant Impact) and the matter will be at an end. 33 C.F.R. pt. 325, app. B, § 7. In determining whether the impact is "significant," the Corps was guided by the definition of that term in 40 C.F.R. § 1508.-27:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity.

1. Impacts that may be both beneficial and adverse....

2. The degree to which the proposed action affects public health or safety.

3. Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farm lands, wetlands, wild and scenic rivers, or ecologically critical areas.

4. The degree to which the effects on the quality of the human environment are likely to be highly controversial.

5. The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

6. The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

7. Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

8. The degree to which the action may adversely affect districts, sites, highways, structures or objects listed in or eligible for listing in the National

Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources.

9. The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

10. Whether the action threatens a violation of federal, state or local law or requirements imposed for the protection of the environment.

The Corps found that the HBHC project would not have a significant impact and thus issued a FONSI at the conclusion of its EA. The plaintiffs have challenged this conclusion on numerous grounds. The Court will examine each of those grounds in determining whether the Corps was reasonable in finding that the project had no significant impact on the environment.

*Wetlands*

■ The plaintiffs allege first that the Corps has erroneously determined that wetlands will not be significantly affected. There is no dispute that wetland degradation is an especially serious matter under NEPA:

From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these guidelines.

40 C.F.R. § 230.1(d).

Furthermore, the Court agrees with plaintiffs that "wetlands are particularly valuable in a semi-arid state like Idaho." Plaintiffs' Post–Trial Brief filed June 1, 1992, at p. 13. How did the Corps treat the wetlands within the projects boundaries?

The Corps verified an estimate of an environmental consultant that 69.45 acres of jurisdictional wetlands existed in the project area of which about 30.99 acres would be lost without mitigation. Record at 2007. Boulder placement in the streambed and irrigation flows from uphill mitigation lands would reduce the affected area

to 24.69 acres. *Id.* To make up for the loss of 24.69 acres of wetlands, the Corps required HBHC to implement its mitigation plan which will add 66.64 acres of wetlands. Record at 1173. This mitigation plan contemplates using water from the power canal to flood irrigate and fill channels to create wetlands. Record at 1173, 1168. HBHC will seed these areas with native grasses and plants, and will plant five-foot tall cottonwood trees throughout the area in an average density of four trees per 1,000 square feet. Record at 1162. The mitigation plan provides as follows:

Implementation of the mitigation plan will result in the development of forested wetlands on the mitigation areas along the canal and the Payette River. The mitigation activities are designed to produce wetland plant communities that are similar in structure and species composition to the riparian forested wetlands to be impacted by the project. As a result, the mitigation wetlands will provide functions and values that are similar to those to be lost due to wetland impacts.

Record at 1160.

The plan also provides that for the two years following planting, monitoring will take place in the spring and fall, and then annually for three additional years. Record at 1158. If the revegetation is not taking hold, reseeding from additional planting may be required.

Is the Corps decision that the project will have no significant impact on wetlands reasonable? The Corps examined alternatives, but discovered that some would actually have a greater impact. Record at 2014–2016. The Corps was ultimately convinced that the HBHC plan was the best alternative because it used the existing abandoned hydroelectric facilities and thereby minimized new impacts on wetlands. Record at 1176. While the plan may be the best alternative, it nevertheless has a serious impact on a very valuable 24.69 acres of wetlands. This impact requires a vigorous and enforceable mitigation plan. The plan in place on this project would add 66.64 acres of wetlands, almost 2.7 times the amount of wetlands adversely

affected by the project. The plan's revegetation program is extensive, and will be monitored for the next five years. In addition, under the § 404 permit conditions, HBHC has a continuing obligation over the life of the project to replenish the cottonwoods on mitigation lands that fail to naturally reproduce. Record at 2046. Finally, these permit conditions also prohibit the project from affecting any additional wetlands.

The Ninth Circuit permits the effect of mitigation measures to be considered in determining whether an agency decision not to prepare an EIS is reasonable. *Friends of the Earth v. Hintze,* 800 F.2d 822, 836 (9th Cir.1986). The Court finds that the mitigation measures imposed on HBHC completely compensate for the adverse effects on wetlands.

The plaintiffs next raise a slightly different wetlands issue. Plaintiffs claim that the Corps has incorrectly concluded that 37.2 acres of wetlands in and around the old power canal was "nonjurisdictional" wetlands. This issue was raised when plaintiffs asserted in their complaint that about forty acres of wetlands would be eliminated when the vegetation was removed from the old power canal. The Corps had earlier found that the 37.2 acres in and around the old power canal was not under its jurisdiction as a wetland because it was an "artificially irrigated [area] which would revert to upland if the irrigation ceased." 51 Fed.Reg. 41,217 § 328.3[a] (Nov. 13, 1986). The power canal has been used as an irrigation canal since Idaho Power Company abandoned it in 1954, and the Corps therefore concluded that the 37.2 acres in and around the power canal were not under its jurisdiction because they were fed by irrigation water.

The plaintiffs now assert that the Corps incorrectly determined that it had no jurisdiction over this area. It is undisputed that after HBHC obtained its § 404 permit, it began construction and removed ninety-five percent of this old power canal vegetation. *See* Transcript of May 11, 1992, hearing, at p. 126, 11. 17–25. The problem is therefore moot. But it is also important to note

that under the FERC license, these lost wetlands must be replaced and an additional ten acres in mitigation is required. So while the § 404 permit did not obligate HBHC with regard to the power canal "wetlands," the FERC license does mandate mitigation.

### Water Quality

The plaintiffs claim that the water quality will be severely diminished by the reduced flows in the bypass reach because Horseshoe Bend's effluent discharge into the river will not similarly decrease, and in fact will increase as the community grows. Thus, more sewage will be added to a much smaller river flow. In addition, the plaintiffs proffered Patricia Klahr, a water quality expert, who would have testified that lower flows would mean higher water temperatures, greater light penetration, more aquatic plant growth, and decreased water quality. The plaintiffs' basic complaint is that although the IDEQ certified water quality for the project, the certification relies too heavily on after-the-fact monitoring.

Under the Clean Water Act (CWA), a certification of compliance with § 401 made by the state agency with that responsibility is conclusive with respect to water quality considerations. 33 C.F.R. § 320.-4(d). IDEQ issued such a certificate on March 13, 1992. While that certification is conclusive for CWA purposes, it is not for NEPA purposes, and the Court must therefore examine the water quality issues.

The IDEQ certification contains certain conditions which are made part of the § 404 permit. For example, HBHC is obligated to file a monitoring plan that will measure water temperatures, dissolved oxygen, turbidity, and nutrient concentrations in the water. Record at 2020. If the monitoring reveals that Idaho water quality standards are being violated, IDEQ will give HBHC thirty days to submit a mitigation plan to correct the problems. In addition, HBHC is to contribute $50,000.00 to the City of Horseshoe Bend to remove effluent from the river. Violations of the

certification could result in a monetary fine.

The plaintiffs assert that the IDEQ and the Corps abdicated their responsibility by failing to study many potential risks to water quality, and by simply relying on post-construction monitoring to identify any problems. But that is an inaccurate characterization. For example, HBHC's consulting engineers did a study, that was reviewed by the Corps, on how the water temperatures would be affected by the project. The study concludes that the average temperature increase in the bypass area would be .85 degree centigrade with a range of zero to 1.3 degrees. Record at 2010. The Corps EA concluded that this temperature increase would be "minor" and that "overall the base in water quality would not be impacted by the non-consumptive water use from this project." Record at 1998.

With regard to sedimentation, HBHC prepared a sedimentation plan. Record at 807–822. That plan provided that construction on the diversion dam will be done in the low flow months between November and February; a coffer dam will be constructed of rock and gravel with very little fine material that would increase water turbidity; and water accumulations in the diversion dam area would be pumped to ponds to allow sediment to settle before the water would be released back to the river. Record at 818. The plan also provided for extensive revegetation of the area and for the use of impervious fabric to lessen soil runoff. Record at 817–818. In the light of these mitigative steps, and the obvious study given the sedimentation problem, the Corps' decision that this is not a significant problem is reasonable. The Corps cannot, of course, know exactly how the project will affect water quality. But the Corps has reviewed studies attempting to model what should happen. Based on these studies, and on a monitoring system that should identify problems before they become serious, the Corps has reasonably concluded that the project will not have a significant effect on water quality.

*Fisheries*

■ The predominant game fish in the bypass stretch is white fish (34%) followed distantly by rainbow trout (4%) and brown trout (2%). The 400 cfs flows in the bypass stretch would be much more conducive to trout than white fish, and the original project assessments assumed that the Idaho Department of Fish & Game (IDFG) would continue to stock that portion of the river with trout. The August 7, 1984, FERC EA notes that the IDFG annually stocks the Payette River in the project area with 2,000 to 3,000 catchable-size rainbow trout. Record at 62. But since then, the IDFG has ceased stocking the river and now manages it as a self-sustaining native fishery. Record at 2002.

This change in management policy sparked concern on the part of the United States Fish & Wildlife Service (USF & WS):

As stated in our letters dated March 6 and 20, 1992, the fishery in the project area has changed since the fisheries mitigation was originally conceptualized. The Federal Energy Regulatory Commission (FERC) license does not provide mitigation for the wild fishery that currently exists. Participation in the Idaho Department of Fish & Game's stocking program is no longer appropriate mitigation. The Corps is obligated to require additional mitigation above and beyond that required by the license articles if FERC mitigation is inadequate. Condition No. 2 does not reflect our desire for additional fisheries mitigation which includes the consideration of fish screens or other barrier structures at the canal intake to prevent wild fish turbine mortality.

The author of this letter, Charles H. Lobdell, USF & WS Field Supervisor, went on to list a number of conditions that USF & WS wanted to see in the § 404 permit. The Corps put these conditions into the permit, and the USF & WS was satisfied. Record at 1442. In addition, the Idaho Department of Fish & Game was also agreeable to the permit with these conditions. Record at 1404.

It therefore appears that the Corps worked diligently to meet the concerns of

these agencies and to reduce the impact of the project on fish populations. One item of mitigation was HBHC's plan to put 2,000 one-cubic yard boulders into the river to enhance fish habitat by creating shelter. In addition, the canal itself will be a fish habitat, and the Corps concluded that fish food—macroinvertebrates—would increase in the power canal to make up for the decrease in the bypass stretch. Record at 2005. About ten to fourteen percent of the fish passing through the turbines would be killed, but HBHC agreed to stock fish or fund fishery enhancement to compensate for this loss. Record at 2004.

The Court finds that the decision of the Corps that the project would not have a significant impact on fish population is reasonable.

### Endangered Species

It is undisputed that an endangered species—the bald eagle—is present in the project area. Given this fact, the ESA requires the Corps to prepare a "Biological Assessment" to determine whether the bald eagle is "likely to be affected" by the project. 16 U.S.C. § 1536(c)(1); *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985). The Biological Assessment may be part of an EA. *Id.* The completed Biological Assessment is then submitted to the regional director of the USF & WS for review. 50 C.F.R. § 402.12(j). The regulations also provide that if a Biological Assessment was previously prepared, a new one is not needed if the Corps certifies that

(1) the proposed action involves similar impacts to the same species in the same geographic area;

(2) no new species have been listed or proposed or no new critical habitat designated or proposed for the action area; and

(3) the Biological Assessment has been supplemented with any relevant changes and information.

50 C.F.R. § 402.12(g) (1991).

In the present case, the USF & WS demanded a Biological Assessment because of the presence of bald eagles. This demand was contained in a letter to the Corps dated January 31, 1992. In response, HBHC reminded USF & WS that the Department of Interior had already concluded that the bald eagle would not be affected. In a letter dated March 7, 1984, Bruce Blanchard, the Director of Department of Interior's Environmental Project Review, stated as follows:

As a matter of information, the only listed or proposed threatened or endangered species known to occur in the proposed project area is the bald eagle. The proposed activity would not be expected to affect the populations that winter in the general area.

Record at 912. The FERC EA referred to this letter in concluding that "the proposed project would not impact bald eagle populations that winter in the general area." Record at 58. The FERC EA is dated August 7, 1984, and that conclusion is not altered in any way in the supplement FERC EA prepared April 1, 1986. This was the same conclusion reached earlier in a consultant's report dated June 1983 that concluded

It does not appear that any threatened or endangered wildlife species occur in the study area, with the exception of a bald eagle, which is an occasional winter visitor, and would not be affected by proposed habitat changes.

Record at 1094.

On the basis of this previous consultant's inventory, the Department of Interior's assessment, and the FERC EA, the Corps concluded as follows:

The project would not impact any threatened or endangered species. Information obtained from the U.S. Fish & Wildlife Service reveals that the area may be used by wintering bald eagles (*Haliaeetus leucocephalus*). No other threatened, endangered or candidate species are known to occur within this area. The riparian corridors of most Idaho streams provide potential wintering habitat for this species, which can range substantial distances for adequate food sources. Because the current use appears very small, construction activities would not result in an adverse impact on this spe-

cies. We anticipate that eagles would still be able to use other riparian zones along the Payette River in the immediate vicinity for their winter activities, which include hunting, fishing, and perching. Power house operation would present some fishing opportunity, provided adequate fish kills occur, but this would not provide more than minor beneficial impacts. Therefore we anticipate no impact on wintering bald eagles.

Record at 2003.

The Court is troubled by the lack of a specific Biological Assessment, and by the absence of a formal approval by the USF & WS Regional Director. But the Court ultimately finds that these requirements have been met even if not so formally labeled. The USF & WS Regional Director has given his approval of the project, and the studies conclude that the bald eagle will not be affected. That is sufficient.

### Recreation

The Idaho Department of Parks & Recreation expressed the concern, shared by others, that a 400 cfs flow in the bypass stretch would be inadequate for canoes, tubers, or other floaters, and that the flow should be increased to 600 cfs. Record at 105. But as previously discussed, the 600 cfs flow would render the project economically unfeasible. The Corps has worked with different groups to ensure the continuation of the reasonable recreational use of this stretch of the river. The Corps agreed with the Western Whitewater Association that the jet boat races in late May could continue.

The diversion structure will contain a bypass for upstream and downstream navigation. This bypass provides two and one-half feet of water depth at 400 cfs. There is also a portage path for those who do not want to use the bypass. The boulder placement will not be unilaterally dictated by HBHC, but will be done in consultation with many groups, including the Idaho Department of Parks & Recreation.

When all the matters in the record are taken into consideration, the Court finds that the Corps was reasonable in concluding that the project would not have a significant impact on recreation.

### Archeological Values

Dr. Mark Plew, the Idaho State Historical Protection Officer, did an archeological assessment of the project and reported his findings to the Idaho State Historical Society (ISHS). ISHS found that the project would have no adverse effect on archeological sites if two mitigation conditions were approved, Record at 2092, and the § 404 permit already provided that the State Historical Protection Officer's proposed conditions would be part of the permit. Record at 2044–2045.

Plaintiffs complain, however, that a significant archeological site will be destroyed. But the permit requires HBHC to evaluate "any historic or prehistoric properties." The permit requires HBHC to work together with the Idaho Historic Preservation Officer to evaluate these sites. Record at 2046. It is obvious from reading the § 404 permit conditions that the State Historic Preservation Officer will be working with HBHC to ensure that no archeological sites are graded over, and that if historic sites are uncovered, HBHC must prepare mitigation plans to protect those sites. Under all these circumstances, the Court finds that the Corps was reasonable in finding that the project will not have a significant effect on archeological sites.

### Icing

The plaintiffs complain that the Corps did not adequately study the problem of icing on the river. But the Walla Walla District Hydrology Branch did a study which found that the project would actually result in a reduction in the potential for ice jam flooding downstream of the diversion dam. Record at 2009. The Corps has acted in a reasonable manner here.

### Cumulative Impacts

The plaintiffs complain that the Corps did not consider the cumulative impacts of the project. The appropriate federal regulations do require the Corps to assess cu-

mulative impacts. 33 C.F.R. § 320.4(a). The Corps did look at cumulative impacts of the project upon the effluent discharges, Record at 2010, and upon the Black Canyon Reservoir, Record at 2011, 2013. In addition, the Corps' EA concluded that the general permit activities within the Payette River Basin would not result in a substantial cumulative impact to the aquatic environment. Record at 1997.

On this cumulative impact point, the Corps deferred to FERC's evaluation of cumulative impacts from past and anticipated future hydroelectric development in the Payette River Basin. Record at 1997. FERC had earlier concluded in its supplement EA that the cumulative impacts would not result in a significant impact. Record at 46.

The Court finds that the Corps properly considered the cumulative impacts as required under the law.

The Court has examined the other allegations and finds that they are without merit. On the whole, as the Court looks at this project, the Court is impressed with the degree to which the Corps has worked with other agencies and other groups in attempting to eliminate and mitigate the impacts of this project on the environment. The Court believes that the Corps has done an admirable job in this regard, and the Court finds that the Corps' decision to issue the § 404 permit was reasonable and not an abuse of discretion. The Court can find no violation of NEPA, the CWA, the EDA, the APA, or any other law. The Court shall therefore dismiss the above-entitled matter.